IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
WESTERN DIVISION

| | | |
|---|---|---|
| Rachel Elizabeth Jetel, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | Case No. 3:25-cv-50329 |
| | ) | |
| James John Jetel, | ) | Judge Iain D. Johnston |
| | ) | |
| Respondent. | ) | |

## ANSWER TO VERIFIED PETITION

Respondent, JAMES JOHN JETEL ("JJ"), by and through his attorneys, Arnoux Sharma Standeford, LLC, and for his Answer to the Verified Petition [Dkt. No. 1] ("Petition") filed by the Petitioner, RACHEL ELIZABETH JETEL ("Rachel"), states as follows:

### INTRODUCTION

1.  JJ admits in part and denies in part the allegations contained in Paragraph 1 of Rachel's Petition. JJ admits Rachel brings this action to compel the immediate return of the parties' four-year-old son, James, to the United Kingdom after JJ returned the minor child to the United States. JJ denies that he "absconded" with James from the parties' "home in London" or that the parties "permanently" abandoned Illinois. JJ affirmatively states (as set forth in further detail below) the habitual residence of the parties' minor child, James, is and always has been the United States of America, specifically in Illinois. The minor child has spent the majority of his life in Illinois and has only spent, in total, sixty-two (62) days in London – of which, only approximately 53 of them were consecutive since the beginning of June 2025.

2.  JJ denies the allegation set forth in Paragraph 2 of Rachel's Petition. JJ affirmatively states (as set forth in further detail below) that he has not had any "change of heart" but rather that any agreement regarding James being in the United Kingdom was strictly subject

to the implied conditions that they would move to England as an intact and monogamous family unit and that Rachel was complying and had complied with the parties' mutual obligations of fidelity, loyalty and monogamy. JJ did not have a "change of heart" about his desire to remain married to Rachel. Instead, on July 23, 2025, just prior to his flight to London to join Rachel and James, JJ discovered to his great shock and horror, that Rachel had been having an affair for over three years with an individual named Simon Morrish and had engaged in secret sexual activities at group events coordinated by a group called "7 Sins" which allegedly is ran by an individual named Anna Huang with others in the United Kingdom. Upon information and belief, 7 Sins caters to commercial and private sex parties. Additionally, Rachel and Simon utilized the app WeAreX to continually find partners for her and Simon to engage with sexually.

   3. JJ denies the allegation set forth in Paragraph 3 of Rachel's Petition that the parties made an "informed choice to make London their new home." JJ admits that Rachel received a new job in London but lacks sufficient personal knowledge to admit or deny the logistics of whether it was "lucrative" and therefore must deny the same. JJ admits they leased their home in Chicago for a one-year lease. JJ affirmatively states was all steps by him in connection with moving to London were induced by Rachel's purposeful omission and withholding of material information from JJ, and her repeated false and misleading expressions of love and loyalty to JJ, such that he did not make an "informed choice to make London their new home."

   4. JJ admits the allegation contained in Paragraph 4 of Rachel's Petition.

   5. JJ admits the allegation contained in Paragraph 5 of Rachel's Petition. JJ affirmatively states he and Rachel have reached various agreements which were memorialized in the proposed Stipulated Order to allow additional access during the proceedings to Rachel after the minor child was secured from being removed from Illinois. Dkt. No. 20.

6. JJ admits that he has placed the minor child in school in Illinois and taken the minor child to medical care providers consistent with the needs and best interests of the minor child.

## RESPONSE TO HAGUE CONVENTION AND ICARA

7. JJ admits the allegations contained in Paragraph 7 of Rachel's Petition.

8. JJ admits the allegations contained in Paragraph 8 of Rachel's Petition.

9. JJ admits Paragraph 9 of Rachel's Petition contains an accurate summary of the Hague Convention objectives but denies the application of the same.

10. JJ admits Paragraph 10 of Rachel's Petition contains an accurate summary of the Hague Convention but denies the application of the same.

## RESPONSE TO JURISDICTION AND VENUE

11. JJ admits the allegations contained in Paragraph 11 of Rachel's Petition.

12. JJ admits the allegations contained in Paragraph 12 of Rachel's Petition.

## RESPONSE TO STATEMENT OF FACTS

13. JJ admits the allegations contained in Paragraph 13 of Rachel's Petition.

14. JJ admits the allegations contained in Paragraph 14 of Rachel's Petition.

15. JJ admits the allegations contained in Paragraph 15 of Rachel's Petition except as set forth that any of the moves would be "a permanent move."

16. JJ admits the allegations contained in Paragraph 16 of Rachel's Petition.

17. JJ admits in part and denies in part the allegations contained in Paragraph 17 of Rachel's Petition. JJ admits the family purchased a home on North Leavitt Street in Chicago in 2022. JJ denies the parties began discussing leaving Chicago for London shortly after purchasing the home.

18. JJ admits in part and denies in part the allegations contained in Paragraph 18 of Rachel's Petition. JJ admits knowledge of Rachel applying for a promotion but denies he had knowledge that the promotion involved relocation to London. JJ affirmatively states he knew having to relocate to London was a possibility, but it was unclear whether they would have to permanently relocate. JJ admits Rachel was selected for the position in summer of 2024.

19. JJ denies the allegations contained in Paragraph 19 of Rachel's Petition. JJ affirmatively states he was not made aware of the visa process until late January when Rachel informed him, she began the visa application process on James and JJ's behalf. JJ did not inform the minor child until much later with Rachel regarding the move to London.

20. JJ admits the allegations contained in Paragraph 20 of Rachel's Petition.

21. JJ admits in part and denies in part the allegations contained in Paragraph 21 of Rachel's Petition. JJ admits that Rachel (without JJ or James) began traveling between Chicago and London in January 2025 but denies knowledge as to where Rachel was staying and where else she traveled to. Notably, Rachel informed JJ that she was attempting to rent out the London flat to other colleagues while she was not there. JJ denies Rachel was bringing the parties' belongings with her on each of several trips. JJ affirmatively states that significant amounts of the parties belonging remain in Illinois, including, but not limited to, the parties' two vehicles, clothes, belongings, bedding, and James' belongings. Many of these belongings remain in a storage unit in Illinois.

22. JJ admits the allegations contained in Paragraph 22 of Rachel's Petition. JJ affirmatively states that he and James only remained in the United Kingdom for approximately 9 days during this trip.

23. JJ denies the allegations contained in Paragraph 23 of Rachel's Petition except that the minor child was signed up for a single, weekend long, piano camp to JJ's knowledge.

24. JJ admits the allegation contained in Paragraph 24 of Rachel's Petition. JJ affirmatively states the family returned from their trip to London on April 6th, 2025 and remained in Chicago until June 4, 2025. A total of 59 consecutive days in Chicago. JJ admits this period was brief, but longer than James' 53 consecutive days in London from June 5, 2025 through July 28, 2025.

25. JJ admits in part and denies in part the allegations contained in Paragraph 25 of Rachel's Petition. JJ admits the parties cancelled the minor child' full-time daycare enrollment as the minor child was completing his time in the program. JJ denies they terminated the employment of their Chicago nanny at this time. The parties terminated the employment of their Chicago nanny in August 2024 as the minor child was starting preschool in August 2024. JJ denies the parties held going away celebrations with family and friends. JJ affirmatively states they had a single gathering with a few friends, but it was not intended as a "going away celebration". JJ affirmatively states JJ stayed in Chicago for work and finishing home renovations. JJ admits the parties gave away a few unnecessary belongings and leased their Chicago home to renters however, many of the child related things which were given away were expected to be returned to JJ and Rachel upon their family having a second child. JJ affirmatively states that prior to his discovery of Rachel's infidelity – the parties had been discussing attempting to have another child. JJ affirmatively states that the Chicago home was rented to renters for a one (1) year lease.

26. JJ admits the allegations contained in Paragraph 26 of Rachel's Petition.

27. JJ admits the allegations contained in Paragraph 27 of Rachel's Petition.

28. JJ denies the allegations contained in Paragraph 28 of Rachel's Petition. JJ affirmatively states the minor child has had difficulty making new friends and has no sense of community in London. The minor child cannot identify any classmates from the London daycare.

29. JJ admits the allegations contained in Paragraph 29 of Rachel's Petition except for asserts that, having been informed of Rachel's infidelity and dishonesty, he did not intend to formally move into the London apartment, and he intended to return with James to Illinois.

30. JJ admits the allegations contained in Paragraph 30 of Rachel's Petition.

31. JJ admits the allegations contained in Paragraph 31 of Rachel's Petition. JJ affirmatively states that although the minor child has never lived at his paternal grandparents' house, he has spent holidays, birthdays, and other special occasions at the house and feels very comfortable surrounded by his paternal family. Additionally, Rachel and JJ resided with JJ's parents for part of Rachel's pregnancy with the minor child. Further, JJ affirmatively states James has resided his entire life in Illinois.

32. JJ admits the allegations contained in Paragraph 32 of Rachel's Petition. JJ affirmatively states that this no contact period only occurred for approximately a single day.

33. JJ admits the allegations contained in Paragraph 33 of Rachel's Petition, except denies that he absconded with the child and affirmatively states that he limited Rachel's access to the child and states that at that time Rachel presented a flight risk, was not acting in the best interests of the minor child and upon information and belief, Rachel had been with her paramour with the minor child on multiple occasions, and had left her paramour with the child, without JJ's knowledge or consent.

34. JJ admits the allegations contained in Paragraph 34 of Rachel's Petition.

35. JJ denies the allegations contained in Paragraph 35 of Rachel's Petition.

36. JJ denies allegations contained in Paragraph 36 of Rachel's Petition. Except admits that, on August 4, 2025, Rachel filed an application for divorce with a court in London which has given the filing the stated file number.

### RESPONSE TO WRONGFUL REMOVAL OF THE CHILD BY RESPONDENT: CLAIM FOR RELIEF UNDER THE HAGUE CONVENTION

37. JJ denies the allegations contained in Paragraph 37 of Rachel's Petition.

38. JJ admits the allegations contained in Paragraph 38 of Rachel's Petition.

39. JJ denies the allegations contained in Paragraph 39 of Rachel's Petition. JJ affirmatively states the United Kingdom was never the habitual residence of the minor child.

40. JJ admits in part and denies in part the allegations contained in Paragraph 40 of Rachel's Petition. JJ admits Rachel has rights of custody over the child. JJ denies there was an unlawful removal from the United Kingdom or unlawful retention in Illinois by JJ. JJ denies there was a breach of Rachel's custody rights.

41. JJ denies the allegations contained in Paragraph 41 of Rachel's Petition.

42. JJ denies the allegations contained in Paragraph 42 of Rachel's Petition.

43. JJ admits the allegations contained in Paragraph 43 of Rachel's Petition.

44. JJ admits the allegations contained in Paragraph 44 of Rachel's Petition.

45. JJ admits the allegations contained in Paragraph 45 of Rachel's Petition.

### RESPONSE TO PROVISIONAL REMEDIES
### 22 U.S.C. § 9004 & HAGUE CONVENTION ARTICLE 16

46. Paragraph 46 of Rachel's Petition does not require a response as it is an improperly pled prayer for relief. To the extent a response is required, JJ denies the same.

47. Paragraph 47 of Rachel's Petition does not require a response as it is an improperly pled prayer for relief. To the extent a response is required, JJ denies the same.

48. Paragraph 48 of Rachel's Petition does not require a response as it is an improperly pled prayer for relief. To the extent a response is required, JJ denies the same.

49. Paragraph 49 of Rachel's Petition does not require a response as it is an improperly pled prayer for relief. To the extent a response is required, JJ denies the same.

50. Paragraph 50 of Rachel's Petition does not require a response as it is an improperly pled prayer for relief. To the extent a response is required, JJ denies the same.

## RESPONSE TO ATTORNEYS' FEES AND COSTS
## 22 U.S.C. § 9007

51. Paragraph 51 of Rachel's Petition does not require a response as it is an improperly pled prayer for relief. To the extent a response is required, JJ denies the same. JJ affirmatively states there was no wrongful removal of the child by JJ. However, JJ affirmatively states that upon the conclusion of this litigation, he should be awarded fees for the costs incurred as a result of this litigation.

52. Paragraph 52 of Rachel's Petition does not require a response as it is an improperly pled prayer for relief. To the extent a response is required, JJ denies the same.

## RESPONSE TO NOTICE OF HEARING
## 22 U.S.C. § 9003(c)

53. Paragraph 53 of Rachel's Petition does not require a response as it is an improperly pled prayer for relief. To the extent a response is required, JJ denies the same.

## AFFIRMATIVE DEFENSE: THE HABITUAL RESIDENCE IS
## THE UNITED STATES OF AMERICA

54. Determining habitual residence is a "fact-driven inquiry", the Court must consider extensive evidence to determine whether a child's "residence in that place has the quality of being 'habitual'" sufficient for it to have become the child's true home. *Monasky v. Taglieri*, 589 U.S.

Page 8 of 13

at 78-81, 140 S.Ct. 719. The Court should consider the extent to which the child has formed connections with the new country, but they are relevant only if they are "meaningful". *Id.* at 78.

55. For younger children, a "mere physical presence … is not a dispositive indicator of an infant's habitual residence. But a wide range of facts … including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual'". *Id*. at 729.

56. Here, James' time in England was insufficient to establish London as his habitual home. He was there for a total of just a few weeks, only 62 days in all and 53 consecutive days. It is well established that a few months in a new country is usually insufficient. E.g. *Holder v. Holder*, 392 F.3d 1009 (9th Cir 2004 (mere 8 months in Germany was insufficient); *Morales v. Restrepo,* 2025 WL 939294 (EDNY March 28, 2025) (4 months was insufficient); *Rodriguez v. Lujan Fernandez,* 500 F.Supp.3d 674 (M.D.Tenn 2020) (4 months was insufficient).

57. James stayed in a temporary rented corporate apartment that was significantly unfurnished, had mostly bare walls, and was not a child's home. The lease was subject to a 6-month "break" clause because the owner was actively trying to sell it. The London apartment furniture was minimal and purposefully cheap. James spent only 32 days in school at a local nursery school but that was scheduled to end within a few weeks. He had no family connections in England. James had no or minimal social connections there, except apparently with Rachel's paramour.

58. A firm and unconditional parental intention to live indefinitely in the new country may be a factor of some degree of significance in the analysis of whether a young child was sufficiently at home in the new location for it be his habitual residence "Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers,

Page **9** of **13**

the intentions and circumstances of caregiving parents are relevant considerations." *Monasky* at 78.

59. JJ's agreement to move to the United Kingdom with the minor child was based on and subject to the necessarily and fundamental implied condition that they would live there with the child as an intact family unit in a monogamous marriage between himself and Rachel pursuant to and in which both parties were loyal, honest, monogamous, and harmonious marriage between JJ and Rachel.

60. At all relevant times prior to July 23, 2025, Rachel consistently assured JJ in words and in substance that she loved him, that she loved only him as her partner, that she wanted to be in a romantic and sexual relationship only with him, and that she was honest to him and loyal to him.

61. At all relevant times prior to July 23, 2025, JJ believed that his marriage with Rachel was monogamous and that Rachel's promises of loyalty to JJ were true.

62. On July 23, 2025, while in Chicago, JJ discovered, to his great shock and horror, that Rachel was engaged in a sexual and romantic relationship with another man, Simon Morrish, in London; that she had been having sexual relations with him for an extended period of time; that she knew Mr. Morrish through her and his work in England; and that she and Mr. Morrish had been holding each other out in England as being in a sexual and romantic relationship couple in England. JJ also learned that Rachel had been having sexual relations with men and women in England for a considerable period of time at and through a sex club in London.

63. If JJ had previously known of such facts he would not have agreed to move to England or to spend any time with Rachel in England, and he would not have agreed that the child could travel to or spend any time in England.

64. Rachel failed to disclose to JJ any of the facts concerning her extra-marital relationships and activities.

65. Rachel knew that if JJ learned that she was having sex with other people JJ would not have agreed that they would move to London.

66. Upon discovering such facts, JJ immediately flew to London, verified many of the facts concerning Rachel's sexual activities, and returned home to Illinois with James.

67. On information and belief, Rachel's purpose and intention in moving with JJ and James to the United Kingdom was to move closer to her paramour, Simon Morrish, who resides in London.

68. Rachel failed to disclose to JJ any of the facts concerning her true intentions and concerning her sexual activities. Moreover, she took purposeful steps to conceal her extra-marital relationships and activities from JJ.

69. Rachel's procurement of JJ's consent to move to England with James by failing to disclose such material facts was fraudulent and dishonest.

70. If, as here, a parent's consent to a child's international relocation is subject to an express, implied or constructive condition precedent, the failure of that condition annuls the consent for all purposes in respect of the Hague Convention, including as to the issue of habitual residence. *See Mota v. Castillo,* 692 F.3d 108 (2d Cir.2012) (Because mother's consent to her daughter's relocation from Mexico, the country of her habitual residence, to United States was impliedly conditioned upon her own ability to enter the United States and join father and daughter in New York, failure of that condition annulled mother's consent for purposes of Hague Convention); *Hofmann v. Sender*, 716 F.3d 282 (2d Cir. 2013) (although the mother and children had moved from Canada to New York with the father's consent, the circumstances indicated that

Page 11 of 13

Docusign Envelope ID: 22861B3E-06C8-4E47-8A02-DEA13952C924

Case: 3:25-cv-50329 Document #: 39 Filed: 09/15/25 Page 12 of 13 PageID #:103

the father intended for the children to reside habitually in New York only if he was in an intact family unit there with his children and his wife, but instead the wife had served him with divorce papers immediately upon his move to New York, thereby establishing that the implied condition was not fulfilled); Ruiz v. Tenorio, 392 F.3d 1247, 1254 (11th Cir. 2004); *Papakosmas v. Papakosmas*, 483 F.3d 617, 625 (9th Cir. 2007); *Maxwell v. Maxwell*, 588 F.3d 245, 253 (4th Cir. 2009); and *Gitter v. Gitter*, 396F.3d 124, 135 (2d Cir. 2005).

71.     James was not habitually resident in England on the date that JJ took him back to Illinois and the petition must therefore be dismissed.

                                               Respectfully submitted,

                                               */s/ Jonathan Standeford*
                                               One of the Attorneys for Respondent

Molshree A. Sharma
Jonathan R. Standeford
Reuben A. Bernick (Of Counsel)
**Arnoux Sharma Standeford, LLC**
200 N LaSalle St., Suite 2310
Chicago, Illinois 60601
(312) 863-2800
notices@asfamlaw.com

Jeremy Morley (Pro Hoc Vice)
**Law Office of Jeremy D. Morley**
230 Park Avenue, Third Fl. West
New York, NY 10169
(212) 372-3425
jmorley@international-divorce.com

Page **12** of **13**

## VERIFICATION

I, JAMES JOHN JETEL, declare under penalty of perjury under the laws of the United States of America that the statements contained in the foregoing are true and correct.

Signed by:

_____
JAMES JOHN JETEL