## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| RACHEL ELIZABETH JETEL, | Case No. 3:25-cv-50329 |
| Petitioner, | |
| v. | Honorable Iain D. Johnston |
| JAMES JOHN JETEL, | |
| Respondent. | |

## MEMORANDUM OPINION AND ORDER

From the jump, it's important to remember the focus of this action. It's not a child custody dispute. The Court doesn't decide or consider who is a better parent. Responsibility for the breakdown in the marriage is relevant only to the extent it bares on the question that is before the Court: was a child wrongfully removed from his habitual residence?

Petitioner Rachel Jetel filed a petition against her husband, Respondent James Jetel, seeking the return of the parties' minor son, J.J.J., to the United Kingdom under the International Child Abduction Remedies Act (ICARA). 22 U.S.C. § 9001 et seq. ICARA implements the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"). T.I.A.S. No. 11, 670, 1343 U.N.T.S. 89 (Oct. 25, 1980). The Convention provides that a parent whose child has been wrongfully removed or retained in the United States may petition for the child's return to his or her country of habitual residence. 22 U.S.C. § 9003(b).

1

The petition was filed on August 4, 2025. Following expedited discovery, the Court held two days of evidentiary hearings. This Memorandum Opinion and Order sets forth the Court's finding of fact and conclusions of law. For the following reasons, the Court concludes that J.J.J. wasn't habitually residing in the United Kingdom at the time of removal. So, the petition is denied.

## I.    Legal Standard

Rule 52 requires a court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). The rule requires a court to "decide whom to believe (and how much to believe) on the basis of the coherence and plausibility of the contestants' testimony, corroboration or contradiction by other witnesses, and other clues [as] to falsity and veracity." *Khan v. Fatima*, 680 F.3d 781, 785 (7th Cir. 2012). The Court must "explain the grounds" of its decision and otherwise demonstrate a "reasoned, articulate adjudication . . . ." *Aprin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008). A court doesn't need to address each piece of evidence but must provide enough facts for the appellate court to understand the court's conclusion. *Oye v. Hartford Life & Accident Ins. Co.*, 140 F.4th 833, 838 (7th Cir. 2025).[1]

In deciding Petitioner's claim, the Court has considered the totality of evidence presented at trial and in the parties' pleadings. The Court has considered

---

[1] That a fact isn't mentioned in this order doesn't mean the Court wasn't aware of it or didn't consider it. Here's just one example. There was testimony about a work homepage that still stated Petitioner lived in Chicago with her husband, child, and dog. Evidence like this doesn't add much to the Court's decision. The Court understands why the evidence was introduced, but evidence like this is of no real moment, so the Court doesn't discuss it.

the weight to be accorded to each piece of the evidence and carefully examined the credibility of the witnesses. The Court has observed and considered, among other things, "each witness' demeanor and facial expressions; intelligence; ability and opportunity to see, hear, or know the matters about which the witness testified; memory; potential for bias; and the believability of the witness' testimony in light of the other evidence presented." *Ho v. Ho*, No. 20 C 6681, 2021 U.S. Dist. LEXIS 129173, *3 (N.D. Ill. July 12, 2021). The Court has also used common and ordinary life experiences to assess credibility and make factual findings. *United States v. Blagojevich*, 614 F.3d 287, 290 (7th Cir. 2010). In making factual findings— including credibility findings—occasionally the Court relies on both Hanlon's razor and Occam's razor. *See, e.g., Hollis v. Ceva Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 624 (N.D. Ill. 2022); *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 870 (N.D. Ill. 2021). These are just tools and the Court recognizes they are not foolproof. *Madison St. Props., LLC v. Marcus Corp.*, No. 20 CV 50471, 2023 U.S. Dist. LEXIS 160196, at *7 (N.D. Ill. Sept. 11, 2023). The Court didn't make any legal, factual, or credibility findings until the conclusion of the proceedings.[2] Although the Court will make specific credibility determinations throughout this order, it pauses here to make general credibility findings of each witness that testified. In doing so, it must be noted that the Court doesn't subscribe to the view of "false in one, false in all." *DR Distribs.*, 513 F. Supp. 3d at 870.

---

[2] *See DR Distribs.*, 513 F. Supp. 3d at 870, 870 n.14 (describing this Court's process for credibility determinations); *Madison St. Props.*, 2023 U.S. Dist. LEXIS 160196 at *6-7 (same).

- Reyna Labra: Ms. Labra was J.J.J.'s teacher at his preschool/daycare in Chicago. She was a credible witness with no reason to shade her testimony. Indeed, the vast majority of her testimony was uncontradicted.

- Tatiana Scantlebury: Ms. Scantlebury was J.J.J.'s very short-term nanny in London. She was a credible witness, whose testimony was generally consistent with Ms. Labra's in describing her interactions with J.J.J. When Ms. Scantlebury couldn't recall a specific fact, she freely stated so and asked if she could review her notes to refresh her recollection. She presented as an honest witness.

- Ruth Benton: Ms. Benton is Petitioner's long-time friend. Ms. Benton was generally a credible witness, although not as powerful or significant as Petitioner may have anticipated. For example, despite apparently being called to show her close relationship with J.J.J., on cross-examination there were long pauses before answering (which obviously aren't reflected in the transcript) and there was some testimony the Court reasonably inferred was inaccurate. For example, Ms. Benton's testimony seemed to indicate that she visited J.J.J. in New York when the parties resided there. That couldn't have happened because J.J.J. wasn't born yet when the parties lived in New York.

- Ian Russell: Mr. Russell was a neighbor and friend of the parties, although he was probably closer to Respondent than Petitioner. Mr. Russell was an outstanding witness. He answered questions fully and

clearly. He provided necessary details to fill in blanks that the Court found to be very useful. He obviously cared for both parties. For example, when the parties were seeking to purchase a home and considering locating near Respondent's parents in Richmond, Illinois, Mr. Russell wisely suggested that they look at nearby properties in Wisconsin that weren't subject to Illinois' unfortunate taxing structure. In doing so, he obtained a Wisconsin real estate license to locate properties. When the parties chose to purchase a home near their rental property in Bucktown, he was their agent and gave his commission to the parties. Anybody would want to have Mr. Russell as a friend. Mr. Russell also corroborated Respondent's testimony regarding joking in text communications, which the Court found useful when considering if Respondent's testimony on cross-examination was credible. The attempt to impeach Mr. Russell because he spoke with Respondent's counsel before trial was a non-starter. First, during twenty-plus years of trying cases, the undersigned never called a witness without speaking to the witness beforehand. Second, Seventh Circuit Civil Pattern Jury Instruction 1.16 unsurprisingly instructs jurors that it is proper for an attorney to meet with a witness. Third, as the late Judge Harold A. Baker used to say, "Only a fool puts on a witness without talking to the witness first."

- Petitioner: At times Petitioner was a credible witness, but at other times, her testimony was simply not credible. As discussed later, for example,

Petitioner's testimony that crime in Bucktown, rather than her extramarital affair, was the driving force to move from Chicago to London was not credible. The job she applied for would allow her to live in multiple cities, including the District of Columbia. But Petitioner testified she only applied for the position—which resulted in a significant pay cut by the way—if she were to work in London, where her paramour, Simon Morrish, lived. And according to this career driven, detail-oriented person, she didn't know or negotiate her salary until after she accepted the position. That's difficult to believe. When asked if these facts allowed the Court to draw the reasonable inference that it was the relationship with Mr. Morrish that caused her to take the job in London, she demurred, contending that the relationship wasn't *that kind* of relationship. Instead, according to Petitioner, it was a casual relationship—one so casual that it lasted multiple years, occurred across continents, and resulted in the destruction of her marriage. When asked by the Court how the relationship could be defined as "casual" when she held herself out as being a couple with Mr. Morrish, her response was utter nonsense and preposterous. What's more, during sworn testimony, she continued to minimize this relationship despite possessing photographs of her and Mr. Morrish together as well as a photograph with Mr. Morrish and his mother (of all people) with J.J.J. Also going to Petitioner's credibility was her Illinois driver's license. The Court is unsure why Respondent's counsel

introduced evidence of Petitioner's Illinois driver's license, which she obtained immediately before leaving for London. The Court didn't put much weight on the license being evidence of residence. Instead, the Court considered the Illinois driver's license for impeachment. Petitioner's driver's license listed her address as her in-laws' address in Richmond, Illinois. But Petitioner hadn't resided there for years. Indeed, she had resided in Chicago for years before renewing her license. Nevertheless, she used this same address as her residence. The Court considers the Illinois driver's license as evidence of Petitioner's casual dishonesty more than her intended residence.

- Respondent: Respondent was generally a credible witness. Much of the critical testimony in this action was consistent with Petitioner's. As to those areas where his testimony conflicted with Petitioner's, Respondent's testimony found corroboration in the evidence. At times, Respondent didn't recall certain events or facts, but the Court was not convinced that Respondent was struck with testimonial amnesia. The cross-examination attempt to somehow establish that Respondent was willing to engage in an open marriage fell flat. For example, when confronted with text messages from a friend in Ireland referencing a woman the friend met online, Respondent testified that he was joking when he asked his friend to send her information to him. The fact that Petitioner introduced no evidence that the woman's information was, in fact, forwarded to

Respondent negated the attempted impeachment. Moreover, as mentioned above, the very credible witness—Ian Russell—noted that he would joke with Respondent in a similar manner. Indeed, when Respondent informed Mr. Russell of Petitioner's affair, Mr. Russell initially believed it to be a bad joke. What's more, the Court's experience—which is likely consistent with most people—is that sometimes it is difficult to determine context and meaning (especially sarcasm) from text and email communications.

This decision on the merits incorporates the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

## II.   The Standard for Evidentiary Rulings

Under the Convention, the Court may consider:

> any other documents or information included with such application or petition or provided after such submission which relates to the application or petition, as the case may be, no authentication of such application, petition, document, or information shall be required in order for the application, petition, document, or information to be admissible in court.

22 U.S.C. § 9005.

Accordingly, this Court didn't reject exhibits on the grounds that they hadn't been authenticated.

But the Court applied the Federal Rules of Evidence. *Walker v. Walker*, 701 F.3d 1110, 1117 (7th Cir. 2012) (applying Rule 408 to a Hague Convention Case);

*Ho*, 2021 U.S. Dist. LEXIS 129173, at *4 (collecting cases applying the Federal Rules of Evidence to Hague Convention proceedings).[3]

## III.    Findings of Fact

The following facts are undisputed except where noted. The parties have proved disputed facts by the preponderance of the evidence.[4]

The parties met in September 2010 in Los Angeles, California. Because of Petitioner's career, they moved to Chicago, Illinois in November 2011, where they legally married in October 2014. Petitioner secured a transfer to her employer's Hong Kong office and the parties moved there together in December 2014 along with their dog, Eva. The parties returned to Illinois in 2017, living with Respondent's parents in Richmond, Illinois. The parties moved to Brooklyn, New York in March 2018. In July 2020, the parties moved back to Illinois after learning that Petitioner was pregnant. The parties moved to Respondent's parents' house in July 2020 and then to a rental property in the Bucktown neighborhood of Chicago in January 2021. Also in January 2021, the Petitioner gave birth to the parties' only child, J.J.J. Throughout this time, and up until July 2025, it appeared that the parties were engaged in a strong, supportive marriage, with little to no conflict.

---

[3] In applying the Federal Rules of Evidence, the Court sustains Respondent's objection to Petitioner's Exhibit 87 as being inadmissible hearsay. In response to the hearsay objection, Petitioner claimed that the exhibit met the business record exception under Rule 803(6). But there was insufficient evidence presented that Exhibit 87 met the requirements of a record of a regularly conducted activity. For instance, insufficient evidence was established as to how the record was prepared, what information the author consulted to include in the document, why the document was prepared, and most importantly that this document was routinely prepared in the ordinary course of business.

[4] The preponderance of the evidence standard isn't high, but it isn't toothless. *US v. Askew*, 193 F.3d 1181, 1183 (11th Cir. 1999).

In January 2022, Petitioner began working for the World Resources Institute (WRI). She remains employed by WRI. In July 2022, the parties jointly purchased a home in Chicago, just around the corner from their rental property. The parties considered renovating the home at that time but did not do so.

The parties expressed some concern about crime in their neighborhood but disputed the extent to which crime impacted their thinking. Both parties acknowledged that while still renting an apartment, shell casings were found very near their apartment on Puerto Rican Independence Day in 2022. Although Petitioner claimed this made her feel unsafe in the neighborhood, she admitted upon cross-examination that the couple nevertheless proceeded to purchase their home in the same neighborhood the following month.

Furthermore, the parties reported that their garage was broken into in 2023. Petitioner reported that this was a frightening experience that furthered her desire to move from Chicago. Respondent downplayed the incident's severity and impact on the parties' thinking. The parties also discussed a string of robberies that occurred in their neighborhood in 2024. At one point, Respondent expressed concern about Petitioner going into the alley behind the house to charge her Tesla. Given this, concerns about crime had some impact on both parties' thinking and was at least a partial reason both parties considered moving to London. But the Court finds the influence of purported crime in Bucktown minimal compared to Petitioner's desire to move to London due to her affair and other "group activities."

10

The Court specifically finds that this was a moving force in Petitioner's desire to move to London.

Petitioner met Mr. Morrish at a work conference in December 2022. Sometime in 2023, Petitioner began an extramarital affair with this London-based individual. Respondent did not know of the affair at the time.

In April 2024, Petitioner began pursuing a promotion to a role that required at least some in-person work in one of several cities. The position required a minimum of eight days in-person per month, but Petitioner reported that additional time in-person would be best for her career. Petitioner also claimed that she only considered London because it would be the best move for her career, would distinguish her from other candidates seeking the promotion, and that she had long wanted to work in London.

Petitioner claims that the presence of Mr. Morrish in London had nothing to do with her interest in London because of the "casual" nature of their relationship. The Court cannot credit this assertion. She introduced J.J.J. to Mr. Morrish and his mother and publicly indicated that she was in a relationship with Mr. Morrish on more than one occasion. These are not typical actions taken in a "casual" relationship. Petitioner also possessed photographs of her and Mr. Morrish cheek-to-cheek and kissing as well as a photograph of her son playing with a toy while Mr. Morrish and his mother watched. Possessing and taking photographs like these are the antithesis of a "casual" relationship. Furthermore, the Court doesn't seriously credit the assertion that Respondent's presence in London would make it *more*

difficult to carry on the affair. Although she would need to navigate Respondent's presence after he joined her in London, Petitioner's convenient proximity to Mr. Morrish—Petitioner's apartment in London is about 45 minutes away from Mr. Morrish's home via the Underground—would make the affair significantly easier to effectuate than had she remained in Chicago. Accordingly, the Court finds that Petitioner's affair had a significant bearing on her desire to pursue the position in London. Respondent supported Petitioner's decision to apply for the position, but—obviously—was unaware of the affair or its nexus to London.

Respondent expressed some concern about the move to London. He testified that he had reservations related to his lack of work, family, and connections to London. On the other hand, he also testified that being in London would allow him to be in closer proximity to Ireland, where a close friend of his resided and which he described as his favorite place in the world. Ultimately, Respondent consented to the move, in large part based on his Irish friend's persuasion.

In August 2024, Petitioner accepted the new position in her company which required her to work a minimum of eight days monthly in London. Petitioner took a pay cut when she accepted the position although salaries are generally lower in the U.K. market. The parties ultimately agreed to move to London and to rent out, rather than sell, their Chicago home. In deciding to rent out their Chicago home, they followed the advice of Ian Russell, a realtor, to renovate the home to attract wealthier individuals and families as renters. Petitioner focused on preparing for the family's arrival in London. In early 2025, Petitioner secured a three-year work

visa for herself and Respondent secured dependent visas for himself and J.J.J. Petitioner secured a spot for J.J.J in a state school for enrollment beginning September 2025. Respondent and J.J.J. activated their visas in March 2025. Petitioner found a nursery for J.J.J. All three were and remain United States citizens.

The parties held a going-away party for themselves with friends in Chicago at the end of May 2025, and another gathering with family on June 2, 2025. The parties disputed the importance of these parties. Petitioner claimed that the gatherings were a significant step towards leaving Chicago behind. Respondent claimed they were smaller celebrations, one of which he only attended for 30 minutes before returning to renovate the home. Despite the dispute and that Mr. Russell believed the move was temporary, it is clear they were, in fact, "going away" parties, held with the intent to say goodbye to loved ones in anticipation of a move to London.

Meanwhile, the parties rented a flat in London for two years, beginning in January 2025. The London lease included a "break" clause permitting either landlord or tenant to break the lease after six months with a two-month notice. The London flat was up for sale when the parties took possession, with no buyers identified. The parties weren't interested in purchasing the London flat and there was a possibility they would be required to move upon its sale.

On June 4, 2025, Petitioner and J.J.J. flew from Chicago to London on a one-way ticket. As planned, Respondent remained in Chicago, continuing to renovate

their home to make it attractive to high-income renters. As of June 24, 2025, the parties secured a year-long tenant for their Chicago home. Their mortgage was approximately $5400/month, including property taxes but not other expenses, while they rented out the home for $6000/month. The net profit realized by renting out the home is minimal. At trial, the parties seemed to disagree on the definition of a "long-term" tenant, but rented out the home for one year, beginning in July 2025. Meanwhile, Petitioner hired a nanny for J.J.J. and enrolled him in a London nursery. Although J.J.J. had a pediatrician and dentist in Chicago, he had neither in London. When J.J.J.—only four-years-old at the time—had an ear infection in London, Petitioner took him to an ENT specialist.[5] J.J.J. made a good friend in nursery—though he never met this friend outside of the nursery—and Petitioner's testimony credibly indicates that he missed his friend after he was removed from London. Before removal, J.J.J. also missed his friends and family back in Illinois, including in Chicago. This is supported by a video in which J.J.J. is playing at a park and asks Petitioner to send the video to several friends and family members in the Chicago area. Respondent enrolled J.J.J. in a week-long piano camp scheduled to begin in August 2025, which he was scheduled to attend with both parents.

Petitioner made several trips to the U.K., bringing some, but not all, of J.J.J.'s toys and belonging. The flat in London was much smaller than the home in Chicago, necessitating some downsizing. The nature of J.J.J.'s belongings left in Illinois was disputed, however. Petitioner argued it was merely sentimental pieces

---

[5] The Court is unsure whether it can take judicial notice that four-year olds get many ear infections, but it is certainly common among children that age.

from J.J.J.'s young childhood in storage. But Respondent argued more significant pieces, such as a bed and J.J.J.'s bike, were in storage or with friends, and that he planned to retrieve the items upon return to Illinois. Many of J.J.J.'s favorite toys and rocks he collected were in London. Petitioner furnished the London flat with beds, couches, chairs, and other basic furniture items. But, based on the documentary exhibits entered into evidence, the flat wasn't fully furnished with personal items such as pictures or family photos hanging on the walls. Although disputed by Petitioner, Respondent credibly testified that he intended to bring the family dog—Eva—to London at some point. Eva was part of J.J.J.'s entire life. She was present when J.J.J. was born. Unsurprisingly, J.J.J. missed Eva. Eva was never brought to London.

Respondent traveled to London with his cello and other items on July 5, 2025, returning to Chicago on July 14.

On July 23, 2025, while in Chicago, Respondent first learned of Petitioner's extramarital affair from an anonymous source who communicated with Respondent through a private investigator. On July 26, 2025, Respondent returned to London and independently verified several aspects of the anonymous report. On July 28, 2025, unbeknownst to Petitioner—who had traveled to the United States for work—Respondent removed J.J.J. from London back to Illinois, where he has resided during the pendency of this action. In total, J.J.J. spent 52 consecutive days in London. On August 4, 2025, Petitioner filed a Verified Petition for the Return of the Minor Child to the United Kingdom, in accordance with the Hague Convention.

15

The above provides an abbreviated summary of the parties' relationship and the underlying dispute. Although the Court has considered every fact presented to it, it now focuses on more pertinent facts.

Respondent moved with Petitioner to a new city because of her job on at least two occasions, Chicago in 2012 and Hong Kong in 2014. A third move, to New York in 2018, offered benefits to both parties' careers. The planned move to London was consistent with their itinerant lifestyle and Respondent's willingness to support Petitioner's professional goals. Although Respondent may have had qualms about the move to London, he unequivocally agreed to the move. He would not have agreed to move to London if he knew about Petitioner's affair and related group activities. The parties did not discuss an end date, but the move was likely intended to be indefinite though not necessarily permanent.

In Chicago, J.J.J. was very loved.[6] He lived in a family home with his mother, father, and dog. He possessed strong ties to his extended family, as well as to numerous neighbors and friends at The Nook daycare. He had a regular pediatrician and dentist. He attended Suzuki piano lessons, was involved in a nanny share, and was extremely well attached to his community.

In London, J.J.J. lived in a reasonably comfortable flat the parties rented. It may have lacked some of the elements that can make an apartment a home, such as family photos and proximity to friends and family. He attended a nursery school in

---

[6] One of the only positive pieces of information to be established at trial is that J.J.J. is loved. As Judge Anthony Peska has said, "A child can't get enough love." The Court hopes that J.J.J. remains loved regardless of what happens in future litigation.

London and was tended to by a part-time nanny. He became more comfortable in London after some initial difficulty adjusting, which was standard when he entered a new environment. He had made at least one friend in nursery, had parks he liked to visit, and places he liked to play. He had yet to have any "play dates" with children he met in London. He missed his friends and family in and around Chicago. He spent only approximately twelve days living in London with both of his parents together.

## IV.  Conclusions of Law

### a.  Legal Framework

"A Hague Convention case is not a child custody case." *Redmond v. Redmond*, 724 F.3d 729, 737 (7th Cir. 2013) (citation omitted). Instead, "the purpose of a Convention case is to determine whether a child has been wrongfully removed or retained from his habitual residence and, if so, to order the child's prompt return." *Baz v. Patterson*, 100 F.4th 854, 865 (7th Cir. 2024). The Court must decide whether Petitioner has shown by a preponderance of the evidence that the child was wrongfully retained away from his habitual residence. *Id.*; 22 U.S.C. § 9003(e)(1). To do so, the Court applies a four-part test:

> (1) When did the removal or retention of the child occur? (2) In what State was the child habitually resident immediately prior to the removal or retention? (3) Was the removal or retention in breach of the custody rights of the petitioning parent under the law of the State of the child's habitual residence? and (4) Was the petitioning parent exercising those rights at the time of the unlawful removal or retention?

*Baz,* 100 F.4th at 865–66.

17

The parties do not dispute, and the Court has no reason to doubt, elements one, three, or four, so the Court proceeds directly to the central issue of this case: What was J.J.J.'s habitual residence?

b. Habitual Residence

Unhelpfully, the Convention does not define habitual residence. *Redmond*, 724 F.3d at 742 (7th Cir. 2013). The Court must determine J.J.J.'s habitual residence "immediately before the alleged ... retention" or removal. *Baz*, 100 F.4th at 866 (internal quotation and citation omitted). Habitual residence doesn't depend solely "on an actual agreement between a child's parents." *Monasky v. Taglieri*, 589 U.S. 68, 77 (2020). Instead, a child's habitual residence is simply where they are at home. *Id*

The concept of "home" is fickle and multifaceted, particularly when examining the home of a young child. "It can be used to signify the place where a person generally sleeps, eats, works, and engages in social and recreational activities, but it can also mean the place where a person feels most comfortable and the place to which the person has the strongest emotional ties." *Monasky*, 589 U.S. at 91 (J. Alito, concurring in part and concurring in the judgment) (internal citations omitted).

In the context of a four-year-old, whose cognizance of "home" is more limited, parental intent is perhaps *more* important in making this determination than it would be for an older child, but even for young children parental intent is certainly

18

not dispositive. *See Redmond*, 724 F.3d at 746 (weighing parental intent with acclimatization based on a child's age).

     i.   **Petitioner Has Failed to Prove that London was J.J.J.'s Habitual Residence**

As previously stated, the petitioner bears the burden of proof to establish the child's habitual residence by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(a); *Baz*, 100 F.4th at 855. And, again, the preponderance of the evidence standard—albeit not onerous—is not toothless. *Askew*, 193 F.3d at 1183; *see also United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012). If the evidence is equally balanced, then the burden of proof has not been met under this standard. *Askew*, 193 F.3d at 1185. "[W]hich party bears the burden on an issue and the quantum of proof necessary to meet that burden is critical, particularly in a close case." *Madison St. Props.*, 2023 U.S. Dist. LEXIS 160196, at *5; *see also United States ex rel. Bilyew v. Franzen*, 686 F.2d 1238, 1248 (7th Cir. 1982) ("If the evidence is closely balanced, then common sense indicates there is a reasonable possibility that who bears the burden of proof will determine the outcome."). Petitioner has not met her burden in this action.

In *Monasky*, the Supreme Court endorsed a totality of the circumstances test to determine habitual residence. *Monasky*, 589 U.S. at 71. This test is basically the same test used by the Seventh Circuit. *See id.*, at 76 (explaining bases for granting certiorari and noting that the Seventh Circuit in *Redmond* rejected applying rigid rules). Before *Monasky*, courts focused on two main considerations: the parents' intent and the child's acclimatization. *Ahmed v. Ahmed*, 867 F.3d 682, 689 (6th Cir.

2017) ("Every circuit to have determined whether a country constituted a habitual residence considers both the acclimatization and shared parental intent standards."); *Redmond*, 724 F.3d at 746 ("In substance, all circuits—ours included—consider *both* parental intent *and* the child's acclimatization, differing only in their emphasis."). Although *Monasky* adopted the totality of the circumstances test, parental intent and acclimatization are still relevant considerations. *Argueta v. Argueta-Ugalde*, No. 22-12840, 2023 U.S. Dist. LEXIS 28434, at *3 (E.D. Mich. Feb. 21, 2023). *Monasky* even says as much. *Monasky*, 589 U.S. at 78. Considering the totality of the circumstances, whether the Court (a) lumps all the facts into the calculus or (b) tries to segregate all the facts under the totality of the circumstances and then places those facts into parental intent and acclimatization buckets[7] to analyze J.J.J.'s habitual residence on July 28, 2025, the Court reaches the same result: Petitioner has failed to meet her burden of proof.

---

[7] Evaluating all the facts under a totality of circumstances test by categorizing certain facts into various buckets is a common analytical process. Determining whether probable cause exists (which is a totality of the circumstances test) often involves placing the facts into various categories. *See, e.g., Illinois v. Gates*, 462 U.S. 213, 233 (1983) (the relevant categories, each moving the needle to varying degrees as a part of the totality of the circumstances test for determining the reliability of anonymous tips and, that each category may provide more or less weight towards a cumulative finding). There's nothing wrong with this. The ultimate decision must be made—of course—in evaluating the *totality*, not merely one bucket at a time. *DC v. Wesby*, 583 U.S. 48, 60-61 (2018) ("[T]he whole is often greater than the sum of its parts—especially when the parts are viewed in isolation.").

    ii.      Analyzing the Facts in an Undifferentiated Amalgam Shows that
           Petitioner has Failed to Meet Her Burden of Proof

At trial, it was established that Petitioner and J.J.J. were physically present in London. But it was also established that J.J.J. was only there for 52 consecutive days. As a family unit, they were only in London for 11 days.

At trial, it was established that Respondent was willing to relocate to London with Petitioner and J.J.J. But it was also established that Respondent would never have relocated there had he known about Petitioner's affair and group activities.

At trial, it was established that the parties rented a London flat. But it was also established that the lease for the flat had a "break" clause that could be effectuated in a short time. And it was established that the parties retained ownership of their home in Chicago, which was rented out with a one-year lease.

At trial, it was established that Petitioner had a bank account in the United Kingdom. But it was also established that was her only financial account in the United Kingdom and that Respondent had no accounts in the United Kingdom.

At trial, it was established that Petitioner was employed in London. But it was also established that the employment was for a three-year term via a secondment agreement. What's more, Respondent didn't possess a job in the United Kingdom, didn't possess a work visa *to* work in the United Kingdom, and his visa, as well as J.J.J.'s, were contingent on Petitioner's visa remaining in good standing.

At trial, it was established that some personal belongings, including some of J.J.J.'s, were moved to London. But it was also established that much personal property remained in Illinois, including vehicles, J.J.J.'s bike, and the family's

beloved dog Eva, to mention but a few. Indeed, so much personal property remained in Illinois that Respondent rented an additional storage unit to keep it. And some of the personal property items were going to be reclaimed by Respondent upon a later, undetermined return to Illinois.

At trial, it was established that the London flat was furnished. But it was only partially furnished with the bare minimum.

At trial, it was established that the parties renovated their Chicago home. But it was also established that they renovated it only for the purpose of attracting wealthy tenants.

At trial, it was established that J.J.J. made a friend in London. But it was also established that he retained friends and family in Illinois that he recalled, missed, and spoke with over the phone.

At trial, it was established that J.J.J. had a nanny in London. But it was established that the nanny worked for less than two weeks before she left on vacation.

At trial, it was established that J.J.J. went to a doctor in London. But it was also established that this was a one-time event for an ear infection.

At trial, it was established that while in London, J.J.J. went to various locations with Petitioner and Respondent. But it was also established that these locations were essentially tourist spots.

At trial, it was established that the parties attended two going-away parties. But it was also established that Ian Russell—the parties' trusted friend—believed Petitioner and Respondent were going to return to Illinois.

The Court could go on. But the point is made. For every fact Petitioner introduced to establish J.J.J.'s habitual residence in London, there were other facts—many of which were more persuasive—that undermined London being J.J.J.'s habitual residence. Petitioner failed to meet her burden of proof.

In reaching this conclusion, the Court finds two cases instructive: *Smith v. Smith*, 976 F.3d 558 (5th Cir. 2020), and *Lee v. Curcio*, No. 25-14096, 2025 U.S. Dist. LEXIS 69663 (S.D. Fla. Apr. 11, 2025), *aff'd* 2025 U.S. App. LEXIS 25734 (11th Cir. 2025).

In *Smith*, the Fifth Circuit Court of Appeals affirmed the district court's finding that Argentina was not the children's habitual residence based on the following facts. Like J.J.J., the children were born in the United States and were United States citizens, as were the parents. *Smith*, 976 F.3d at 563. The children in *Smith* lived in Argentina for two years, far longer than the two months J.J.J. was in London. Except for the two years in Argentina, like J.J.J., they had never lived outside the United States. *Id.* The *Smith* court also found that the continued ownership of real property in the United States weighed against finding habitual residence in Argentina. *Id.* The *Smith* court affirmed despite the parents' decision to move to Argentina and share a marital home there, that the petitioner obtained a court order during a divorce proceeding providing him with certain custody rights,

23

and that the children attended school in Argentina (albeit an "American school"). *Id*. at 562, 563.

In *Lee*, the district court's finding that the child was not a habitual resident of Brazil was affirmed on appeal, based on these facts. The district court found that Brazil wasn't the habitual residence despite the fact that the parents shipped belongings to Brazil, obtained passports and visas, visited potential schools for the child (one of which the child eventually attended), and viewed apartments, eventually signing a lease for an apartment. *Lee*, 2025 U.S. Dist. LEXIS 69663, at *7-10. The parents and child remained in Brazil for about sixty days. In doing so, the Eleventh Circuit focused on the claimed acclimatization by the child:

> The district court acknowledged the evidence that [the child] was establishing roots in Brazil, such as his enrollment in school and extracurricular skateboarding. But the 'weight of the evidence' suggested that he was not so acclimatized that his residence in Brazil had become habitual. The district court noted that the parties are all U.S. citizens and were in Brazil for only approximately sixty days. Moreover, the majority of [the child's] family is in the United States, where [the child] has spent most of his life.

*Lee*, 2025 U.S. App. LEXIS 25734, at *8.

In this action, like the child in *Lee*, J.J.J. was establishing roots and enrolled in nursery (but not school) and was signed up for (but didn't attend) extracurricular activities. But these facts were insufficient. Critically, the child in *Lee* was also only in Brazil for sixty days, the same time frame J.J.J. was in London. And, just like the Petitioner and Respondent in this action, they leased an apartment in another country and shipped some belongings there. But again, these facts—even in

24

conjunction with the other favorable facts—were insufficient to establish the child's habitual residence.

At the conclusion of the trial, counsel for Petitioner cited several cases he asserted supported Petitioner's complaint. Because Hague Convention cases are based on the totality of the circumstances, the cases can all be distinguished on the facts.[8] One cited case was *Goldstein v. Simon*, No. 24-12098, 2024 U.S. App. LEXIS 24300 (11th Cir. 2024). But in that case, the district court found the respondent's testimony regarding habitual residence credible over the petitioner's testimony. *Goldstein*, 2024 U.S. App. LEXIS 24300, at *8. Another distinction is that the children in *Goldstein* were older, so the acclimatization weighed against the petitioner. *Id.* at *9. In contrast, J.J.J. is merely four years old. Another case Petitioner's counsel cited was *Schram v. Zarak*, 21-cv-6524, 2021 U.S. Dist. LEXIS 212008 (S.D.N.Y. Nov. 2, 2021). But again, that case involved critical factual distinctions. First, as in *Goldstein*, the trial judge credited one party's testimony over the other's. *Schram*, 2021 U.S. Dist. LEXIS 212008, at *86-87. In this case, that factor cuts the other way. Second, the parties in *Schram* packed 72 boxes and moved them to Iceland. In contrast, although the parties moved dishes, pots and pans, and some of J.J.J.'s toys and rocks to London, much of their personal property remained in Illinois, including J.J.J.'s bike. Indeed, Respondent leased a second unit to store what was left behind. What's more, some of the personal items that were given to others were going to be retrieved by the parties. Third, in *Schram*, the

---

[8] For example, the Court recognizes that the visas obtained in the *Lee* case were tourist visas, not work visas.

25

parties sold their home in the United States and purchased a home in Iceland. The district judge found this fact to be "significant." *Id*. at *74. In contrast, the parties here rented a flat in London and the lease included a "break" clause that became effective after a short time. And they found tenants who signed a one-year lease for their house in Chicago, which they continue to own to this day. *Goldstein* and *Schram* were the most persuasive cases cited, but because they are readily distinguishable, they failed to sufficiently persuade.

 iii. Analyzing the Totality of Circumstances by Placing the Facts into Parental Intent and Acclimatization Buckets Shows that Petitioner has Failed to Meet Her Burden of Proof

Like the other relevant considerations, parental intent is not dispositive. *Monasky*, 589 U.S. at 68-69 ("no single fact is dispositive across all cases."). But because this case involves a young child, the "intentions and circumstances of caregiving parents" matter a great deal. *Id.* at 78. The moment of last shared parental intent is a relevant consideration. *Redmond*, 724 F.3d at 744. Petitioner intended to move to London with J.J.J. Respondent shared this intent until he confirmed existence of the affair. Respondent wouldn't have moved if he had known about the affair and Petitioner's activities. Consistent with prior behavior, he moved to support Petitioner and continue his family life. His discovery of Petitioner's long running affair and activities came as a devastating personal shock.

Courts have repeatedly recognized that "if only one party has a conditional intent to relocate, and the other party does not, 'it cannot be said the parents shared an intent.'" *Grano v. Martin*, 443 F. Supp. 3d 510, 536 (S.D.N.Y. 2020), aff'd, 821 F.

App'x 26 (2d Cir. 2020) (quoting *Mota v. Castillo*, 692 F.3d 108, 115 (2d Cir. 2012); *Ho*, 2021 U.S. Dist. LEXIS 129173, at *26-27. A question in this case, then, is whether Respondent's intent to relocate was valid given that Petitioner was concealing from him that she wasn't being monogamous.

The Court explores this question by turning to common sense. Common sense is at the heart of the habitual residence inquiry. *Monasky*, 589 U.S. at 77. It's a capacious but helpful guide. *See Illinois v. Gates*, 462 U.S. 213, 230-31, 238 (1983) (instructing judges to apply a common-sense approach to the Fourth Amendment's probable cause requirement for the issuance of warrants).

Common sense says that monogamy is generally (but not necessarily always) an explicit condition in a committed marriage, let alone an implicit one. *See Obergefell v. Hodges*, 576 U.S. 644, 657 (2015) (noting marriage "allows *two* people to find a life that could not be found alone . . . .") (emphasis added). The facts in this case show that it was a condition of these parties' marriage. Scattered, vague, and sarcastic conversations and comments to the contrary don't displace this conclusion.

Common sense and the testimony in this case indicate that Respondent's willingness to move to London was conditioned on the continuation of a monogamous relationship. Although unknown to Respondent, this condition didn't exist throughout the period during which the parties considered moving to London or during the initial move. "[E]vidence of a child's acclimatization obtained wrongfully should be discounted . . . ." *Baz*, 100 F.4th at 876 n.1 (J. Hamilton dissenting). Given the requirement to consider the totality of circumstances,

27

evidence of intent that was fraudulently induced should be discounted too. Respondent's intent, induced through non-disclosure of the affair, was induced fraudulently. A party "should not be able to better her position by such deception . . . ." *Id.* It can't reasonably be said the parents truly shared an intent.

The breakdown of a relationship is likely the *sine qua non* of a Hague Convention case. A partner in a happy relationship doesn't abduct his or her child. The Court recognizes that habitual residence can't turn on one parent's displeasure that things are not turning out the way he or she hoped. A party can't wake up five years into a move, declare that he is unhappy, that his happiness was a condition of the move, and claim that this negates his intent. Using common sense, a court wouldn't need to credit such testimony. But that's also not what happened between Petitioner and Respondent. Respondent discovered the existence of the long-running affair just 52 days into J.J.J.'s stay in London, and when Respondent had only been with the family in London on-and-off for 11 of those days. The habitual residence inquiry is one based on *circumstances*. When the circumstances change—like when a parent suddenly learns that the reason supporting the intent to move was founded on a lie—so will decisions. There was no real shared intent in this case. To assert the existence of a shared parental intent blinks the reality of how Respondent's acquiescence was obtained.

Shared parental intent matters and it often dovetails into issues surrounding acclimatization. The longer a child resides in a locale because of a shared parental intent, the more likely it is that the child has acclimatized. Likewise, the longer a

child resides in a locale because of a shared parental intent, the older the child will be with the passage of time, which will add weight to the child's acclimatization.

Acclimatization is part of determining the child's home. *Baz*, 100 F.4th at 867 (quoting *Monasky*, 589 U.S. at 78). But home isn't built in a day. *Mozes v. Mozes*, 239 F.3d 1067, 1078 (9th Cir. 2001) (abrogated on other grounds by *Monasky*, 589 U.S. at 84). Building a home requires "the passage of an appreciable period of time . . . that is sufficient for acclimatization." *Mozes*, 239 F.3d at 1078 (citations omitted). The timeframe through which one views the child is important. "A child who spends two months at [summer camp], if observed only during that period, would appear to be habitually resident there." *Mozes*, 239 F.3d at 1074. Like parental intent, the acclimatization inquiry is fact driven, not categorical. *Baz*, 100 F.4th at 866. Again, a court "must be 'sensitive to the unique circumstances of the case and informed by common sense.'" *Monasky*, 589 U.S. at 78 (quoting *Redmond*, 724 F.3d at 744).

Here, though concededly a close call, Petitioner has failed to meet her burden to prove that J.J.J. was acclimatized in the United Kingdom. In the 52 consecutive days J.J.J. spent in the United Kingdom, he certainly took steps towards acclimatization. He attended nursery, began being cared for by a nanny, made a friend, and had started settling into a routine home life with his mother. Many of his toys and valuables had made the trip to London, and he had begun growing his rock collection there.

But he had also attended no play dates, had not started "big" school (as the parties called it), had not started piano lessons, and—importantly—had spent only

29

11 days as a family unit, with his mother and father both present in the country. His nanny had been with him only 13 days before leaving on vacation. The family dog had not yet made the trip. Many of J.J.J.'s childhood possessions remained in Illinois as did his extended family and longer-term friends. Up until the beginning of June 2025, J.J.J.'s entire life existed in Illinois.

Indeed, J.J.J.'s behavior and activities would appear much closer to that of an extended tourist (or, as compared to in *Mozes*, a summer camp participant) than a resident. J.J.J. went to several tourist attractions and a public library but had not been secured a membership to regularly attend any of them where membership was necessary. Indeed, J.J.J.'s time in London was akin to what the Brits refer to as "holiday."

The Court acknowledges the issues in this case have elements of the harm the Hague Convention is designed to prevent—"unilateral decisions to remove children across international borders." *Monasky*, 589 U.S. at 81. But *Monasky* instructs courts to conduct more searching inquiries based "on the totality of the circumstances specific to each case." *Id.* at 71. The Court has done so. Although acknowledging that this is a difficult case, the Court considered each piece of evidence and carefully weighed the credibility of the witnesses. Based on all the circumstances, including but not limited to the parents' intentions and J.J.J.'s acclimatization to London, Petitioner has failed to prove by a preponderance of the evidence that J.J.J. was at home in London on the date of removal. He wasn't yet a habitual resident there.

Accordingly, the petition is denied, and the action is dismissed.


Entered: October 31, 2025                    By: _____
                                             Iain D. Johnston
                                             U.S. District Judge